IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAULA J. FULTZ, <br><br> Plaintiff, <br><br> v. <br><br> RR DONNELLEY & SONS COMPANY LONG TERM DISABILITY PLAN, <br><br> Defendant. | CIVIL ACTION <br> NO. 15-0319 |

**MEMORANDUM**

**SCHMEHL, J.  /s/**                                                                                     May 27, 2015

      This case concerns a claim for long-term disability benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* (ERISA). The plan administrator denied the claim and Plaintiff's appeal. The parties have filed cross-motions for summary judgment. Although cross-motions usually lead to a ruling that resolves the case, in this instance, the court will deny both motions but remand to the plan administrator because questions of fact remain with respect to a material issue.

Factual Background

      Though the parties were unable to stipulate to a joint statement of facts, a summary of the facts of the case can be readily drawn from those parts on which they agree. Plaintiff Paula Fultz was employed by RR Donnelley & Sons as a financial services account representative, a generally sedentary position. Plaintiff had short-term and long-term disability coverage through her employment; Defendant self-funded the short-term benefit but purchased insurance from Aetna for the long-term benefit, and

Aetna administered both aspects. According to defense filings, the proper named defendant in this action would be R.R. Donnelley & Sons Co. Group Benefits Plan; the Court has endeavored to refer to "Defendant" only when discussing the defense's statements and arguments in this litigation and to use "Aetna" when describing actions taken in administering the plan and Plaintiff's claims for benefits.

Plaintiff fractured her ankle on May 4, 2013, and had surgery twice that month, once more in July 2013, and yet again in August 2014. She also suffers from complex regional pain syndrome, fibromyalgia, lumbar facet arthropathy, lumbar spinal stenosis, neurapraxia in the left saphenous nerve, and ankle, back, and thigh pain. At various times, Plaintiff reported pain at levels from three to ten on a ten-point scale. At least as early as April 2014, Plaintiff was taking oxycodone for her pain.

These medical problems prevented Plaintiff from working starting April 30, 2014. Plaintiff's orthopedic surgeon had cleared her to work as long as she could use crutches and a brace or boot and work in a location that would limit her walking. Donnelley told Aetna those conditions could be accommodated, but that Plaintiff "would be taking either Oxycodone or Oxycontin for her pain and her physician described the potential side effects of each of those. We did not feel we could accommodate her for this reason" (AETNA 0314).[1] Aetna approved her claim for short-term disability benefits, which continued until their expiration on November 4, 2014.

Anticipating the end of her short-term benefits, Plaintiff applied for long-term disability. Aetna denied the claim on September 25, 2014. Post-operative instructions from the August 2014 surgery indicated light duty at six weeks after surgery and full duty at twelve weeks. Aetna noted that Plaintiff's occupation is considered sedentary (as

---

[1] "AETNA XXXX" citations are to the administrative record and follow the pagination as presented.

defined in the national economy under the plan terms) and that Plaintiff could perform the types of duties included in sedentary work once she was released to light duty; therefore, her disability would end before the long-term disability timeframe.

Plaintiff appealed the denial of long-term disability benefits. In support of her appeal, Plaintiff submitted two attending physician statements prepared in early October 2014. Dr. Juliano, who performed her surgery, noted Plaintiff was recovering from surgery, had no ability to work, and had left-leg weight bearing limits, but actually gave a date for Plaintiff's return to work several days before the report. Dr. Eltz, Plaintiff's family doctor, noted pain, decreased range of motion in the ankle, the need to wear a boot for walking, and that Plaintiff could only occasionally stand, walk, drive, push, pull, bend, or stoop, and never lift. In her appeal, Plaintiff also reiterated that her employer would not let her return to work while using oxycodone. Both Dr. Eltz and Dr. Juliano confirmed she was using oxycodone, and Dr. Juliano noted some associated drowsiness. Plaintiff also reported to Aetna she still had constant pain, that her surgery had been unsuccessful, and that she would be needing subsequent ankle fusion surgery.

Aetna sent Plaintiff's records for peer review. Dr. Ayyar, a specialist in occupational medicine, found the records inadequate to substantiate any particular limitations from any of Plaintiff's medical conditions; mainly, he concluded it was unclear how Plaintiff had responded to the August 2014 surgery and that information on her other conditions was limited. Aetna had specifically asked Dr. Ayyar about Plaintiff's oxycodone usage, and he concluded that she was suffering no adverse effects and, again, that the records did not clearly indicate whether Plaintiff had responded well to the surgery, potentially decreasing her use of oxycodone. A psychological expert, Dr. Gay,

also conducted a peer review and found no cognitive impairment associated with either Plaintiff's reports of anxiety or her use of medication (there is no specific reference to oxycodone).

Aetna denied Plaintiff's appeal in a letter dated November 25, 2014. Relying on the peer review reports, Aetna concluded that "the medical evidence does not substantiate a functional impairment" (AETNA 0239). The letter does not discuss Plaintiff's use of oxycodone or conduct any analysis of her occupational duties either in her specific job or as defined in the national economy.

Plaintiff filed suit in Lancaster County seeking the long-term disability benefits denied by Aetna. Defendant removed the suit because the claims are governed by ERISA, and the matter is now before the Court on cross-motions for summary judgment.

Standard of Review

Only late in the briefing did Plaintiff commit to the argument that the Court should apply a *de novo* standard of review rather than an arbitrary and capricious standard, but the position is ultimately persuasive. *De novo* review applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case an arbitrary and capricious standard applies. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The policy language determines whether the fiduciary has discretion and is entitled to the more deferential standard of review; ambiguous language does not clearly provide the necessary discretion and thus entails *de novo* review. *See id.* The Third Circuit has

offered the following "safe harbor" language that a policy can use to ensure an arbitrary and capricious standard: "Benefits under this plan will be paid only if the plan administrator decides in [its] discretion that the applicant is entitled to them." *Viera*, 642 F.3d at 417 (quoting *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000)). Although these particular terms are certain to be sufficient, they are not required; the question is whether the language clearly grants discretion.

In considering the policy language in this case, a good starting point is a similar case that also involved Aetna. Although it is an unpublished opinion, the pertinent language in both this case and that one starts out with the identical phrase: "a fiduciary with complete authority to review all denied claims for benefits under this Policy." (AETNA 0123); *Jabara v. Aetna Life Ins. Co.*, No. 3:13·CV·02041, 2014 WL 6769971, at \*2 (M.D. Pa. Dec. 1, 2014). However, the policy in *Jabara* added: "In exercising such fiduciary responsibility, [Aetna] shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein." *Id.* By contrast, the additional language in this case says: "We shall have duty to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits" (AETNA 0123). This language speaks of duty rather than discretion; having an obligation to make a decision is not the same as having the authority to make that decision as one sees fit and according to whatever standards or calculations one might like to employ. The language in this case even goes on to note that the "duty shall be subject to applicable state laws such as those governing external or independent review" and that Aetna has "the right to adopt *reasonable* policies,

5

procedures, rules, and interpretations of this Policy *to promote orderly and efficient administration*." (*Id.* (emphasis added)). Describing Aetna's role as a *duty* with expressly noted constraints (compliance with the law; interpretations, etc., must be reasonable and directed toward the particular goals of orderly and efficient administration) provides a very different flavor from the "discretionary authority" language in *Jabara*.

Defendant argues there is additional language that confers discretion, but that language is far afield in another part of the plan documentation where the reference to discretion is structurally different. There, the language refers to assignment of authority or purview among the different actors or positions carrying out administration of the plan; it does not confer discretion on the fiduciary or plan administration overall.[2] The different function of this language and its location (separated from the primary terms concerning the authority granted to the fiduciary) mean that it does not contribute to the clear statement of discretion that would be necessary to avoid *de novo* review.

If Aetna has the discretion it claims, therefore, it must rely solely on the primary clause's reference to "complete authority to review all denied claims." Defendant argues this is sufficient because "[t]he phrase 'complete authority,' however, has virtually the same import as the phrase 'discretionary authority'—any entity with 'complete authority' over a determination clearly has discretionary authority over that decision" (Defendant's Reply in Support at 3). The seductive obviousness of this argument is undermined,

---

[2] Defendant cites a section of the plan titled "Part 6.6 – <u>Discretionary Authority of each Applicable Named Fiduciary</u>," which reads in part: "Each Applicable Named Fiduciary shall have full and complete authority to control and manage . . . *that portion of the administration and operation of the Plan or Trust allocated to such Applicable Named Fiduciary*, including, but not limited to, the authority and discretion to," among other things, make final appeals determinations (AETNA 0033) (emphasis added). The definition of "Applicable Named Fiduciary," which Defendant also cites, confirms that the point of this part of the policy language is not to grant discretion, but rather to parcel out and delegate whatever overall authority the plan administration has elsewhere been granted: "'Applicable Named Fiduciary' means, *with respect to any authority, control or discretion in the operation, administration or management of the Plans*, the Administrative Named Fiduciary who is charged with . . . such matter" (AETNA 0011) (emphasis added).

6

however, by the weakness of its accompanying citations, which are variously inapposite or not specific about what the policy language involved actually said.[3] And in other cases concerning the "complete authority" language, the phrase is supplemented by further clear reference to discretion.[4] The phrase "complete authority" is even less effective standing by itself in this case because of the opposing "duty" language discussed above. Further, in this case, the phrase "complete authority" applies to the phrase "to review all denied claims"; normally, the primary statement of discretionary authority applies to the determination of eligibility and entitlement to benefits. Here, those matters follow the odd "duty" language, and in fact, the clause does not even discuss authority to determine

---

[3] Both *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1159 n.2 (3d Cir. 1990), and *Universal Health Servs., Inc. v. Aetna, Inc.*, No. 2:03-CV-02235-CG, 2003 WL 22016914, at *4 (E.D. Pa. July 8, 2003), are somewhat off-topic, addressing questions of whether the relevant entities were even acting as fiduciaries rather than whether the fiduciaries had been granted sufficient discretionary authority to warrant a deferential standard of review. *Songer v. Reliance Standard Life Ins. Co.*, No. 15CV0033, 2015 WL 2098126, at *2, *8 (W.D. Pa. May 5, 2015), *appeal dismissed* (Aug. 7, 2015), is on-point but does not include any actual quotation of plan language; the Court simply describes the plan as granting complete authority, though of course the fact that the Court thought that concept equivalent counts for something. *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012), does indicate that "complete authority" in several respects is a direct quote from the plan language, though the issue was undisputed, so it was not carefully addressed by the opinion, which in any event comes from another circuit.

[4] *See, e.g.*, *Sessa v. Dell, Inc., Long Term Disability Ins. Plan*, No. 14-CV-2518, 2015 WL 3631735, at *13 (E.D. Pa. June 11, 2015) (uses "complete authority" but goes on to say "discretionary authority to determine entitlement," "sole and complete authority to determine eligibility," and "Provider's decision on any claim is final"); *Reeder v. Aetna Life Ins. Co.*, No. 4:14-CV-0161, 2015 WL 3622300, at *6 (M.D. Pa. June 9, 2015) (same initial language but adding "discretionary authority" and "Aetna shall be deemed to have properly exercised such authority. It must not abuse its discretion by acting arbitrarily and capriciously"); *Keiser v. Conagra Foods, Inc.*, 57 F. Supp. 3d 399, 405 (M.D. Pa. 2014) ("The [Committee] shall have *full and complete authority, responsibility, and control* over the management, administration and operation of the Plan and Trust fund, *including, but not limited to, the sole and absolute discretion* to: (i) construe and interpret the Plan; (ii) decide all questions of eligibility to participate in the Plan; (iii) determine the amount, manner and time of payment of any benefits to any Participant, Beneficiary or other person . . ." (emphasis added)); *Osborne v. Aetna*, No. CIV.A. 12-2393, 2013 WL 3168657, at *6 (D.N.J. June 20, 2013) (same initial language but, as in *Jabara*, adding "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms"); *Jones v. Aetna Life Ins. Co.*, No. CIV.A. 01-2476, 2002 WL 1870469, at *3 (E.D. Pa. Aug. 14, 2002) (notes "complete authority to review all denied claims" but also "discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits," plus "Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously").

eligibility. Instead, it just seems to assume eligibility and note a *duty* to determine whether and to what extent eligible employees are entitled to benefits.

So while the recommended safe harbor language is not required, the language in this policy differs from and even runs counter to the recommended language (and other phrasing that has been ruled sufficient) in so many ways that the Court cannot say the necessary clarity remains. As a result, the Court will apply a *de novo* standard of review.

Review of Plaintiff's Claim for Long-Term Disability Benefits

Many of the particular arguments in the parties' briefs do not really line up with the analysis that is ultimately required in this case. Partly, that is because those arguments are premised on an arbitrary and capricious, rather than *de novo*, review; it is also partly the result of other issues with the analysis discussed more fully below. Nevertheless, the Court will briefly address some of the arguments made because they provide context for the later analysis.

At least two of Plaintiff's points are mistaken. First, Plaintiff attacks Aetna's reliance on Dr. Ayyar's opinion because Dr. Ayyar mistakenly notes that Plaintiff has no "biochemical limitations." As Defendant notes, this was simply a typographical error. The surrounding text of Dr. Ayyar's report is an assessment of whether Plaintiff has any "biomechanical limitations"; it was not a confused or irrelevant discussion about "biochemical" issues. Second, Plaintiff is obviously wrong to state that "Dr. Eltz noted that the Plaintiff had no capacity to sit, stand, walk, drive, push, pull and bend." In citing Dr. Eltz's report at AETNA 0648, Plaintiff seems to have misinterpreted several markings on the report as being zeroes when they are in fact the letter "O," meaning

"occasional." Moreover, the mark for sitting is a "C" for "continuous," and the "Never" written in for lifting should have made clear that the other marks were not zeroes.[5]

On the other hand, there is at least one relevant error in Dr. Ayyar's report. The doctor states: "It is not clear, furthermore, whether or not the claimant's consumption of oxycodone continued following the August 20, 2014 ankle surgery. It was not clearly stated whether or not the ankle surgery ameliorated the claimant's pain to the point where it diminished her consumption of oxycodone" (AETNA 0356). The doctor relied in part on this lack of information to conclude Plaintiff's use of oxycodone had not been shown to have an impact on her ability to function in "the timeframe under review, October 1, 2014 through November 30 2014" (AETNA 0357). In fact, the record contains ample indication that Plaintiff still needed and was taking oxycodone during that time and that the surgery had not resolved that need. Notes in the claim file indicate Plaintiff informed Aetna in early October 2014 that she was taking fifteen milligrams of oxycodone five to six times a day and that her employer would not let her return to work because of it (AETNA 0278, 0281, 0304, 0305, 0647), and Dr. Ayyar was aware of the employer issue (AETNA 0355). Dr. Juliano's attending physician statement, dated October 8, 2014 (with a most recent visit date of September 18 and an expected next visit December 18), reports continued ankle pain and oxycodone usage (AETNA 0646, 0647). Dr. Eltz's statement, dated October 1, 2014 (based on an office visit that same day), explicitly notes "oxycodone 15 mg every 4-6 hours at least through 12/14 – 1/15" (AETNA 0648). And

---

[5] Although it is easy to see that Plaintiff is incorrect about the report, it is worth noting that the form and its codes have some inherent confusion. The form asks the attending physician to rate the patient's capacity for various activities with a scale of "(O)ccasional - .5 – 2.5 hrs," "(F)requent – 2.6 – 5.0 hrs," or "(C)ontinuous – 5.1 – 8.0 hrs." This scale appears to conflate frequency and duration; the words refer to how often patient can do an activity, while the numbers seem to indicate how long she can do it for. The concepts are not absolutely at odds, but the confusion makes the report unclear.

9

notes in the claim file state that Plaintiff reported on October 2, 2014, "that she still has constant pain in the ankle rated as 4-5/10 when sitting and 8-9/10 when standing" and that "[s]he was told by [D]r. Juliano that the S[urgery] on 8/20 was unsuccessful and will need ankle fusion S[urgery]. . . . Takes the oxycodone 15 mg up to 6 times a day. Her [employer] will not allow her to [return to work] while taking this medication" (AETNA 0839). So Dr. Ayyar's statement on this issue is erroneous.

Ultimately, though, these points about whether Aetna's decision appropriately relied on the various reports and so on are targeted toward the question of whether the decision was arbitrary and capricious. Since the Court is conducting a *de novo* review, with respect to the above issues it is sufficient to recognize that the Court's own review of the record indicates that Dr. Ayyar found no biomechanical limitations; that Dr. Eltz noted some capacity to sit, stand, walk, drive, push, pull, and bend, rather than no such capacity; and that Plaintiff was still having problems, and using oxycodone for pain, in the post-surgery, long-term-disability timeframe. Further, though Dr. Ayyar found there were no "continuous adverse effects associated with oxycodone usage" (AETNA 0356), he did not note the indication on Dr. Juliano's report that the medication was causing drowsiness. Dr. Ayyar's reliance on reports from several months earlier that Plaintiff was alert and did not appear sedated would likely be acceptable under a deferential review standard, but in this *de novo* review, the Court places weight on the later report and finds Plaintiff experienced some drowsiness as a result of her oxycodone usage.

The misalignment of the above arguments with this Court's analysis also results from the parties' agreed assumption that Aetna found that employers in the national economy would not prohibit Plaintiff from working while taking oxycodone; it is not

10

clear Aetna made any such determination. Plaintiff's statement of facts at paragraph thirty-four states: "According to Aetna, no other employer in the national economy would have any concerns about allowing an employee to work while consuming a significant amount of Oxycodone." Notably, of the fifty-nine paragraphs in Plaintiff's statement of facts, this is the only one that does not contain a citation to the record. The reference to this issue in Defendant's statement of facts says: "There is no vocational evidence in the file that supports Aetna's finding than an employer in the national economy would allow an employee to work while consuming 15 mg. of Oxycodone every four hours."[6] It is odd that Defendant's version would acknowledge a lack of evidence for its own finding, but what seems to really be going on is that there is no evidence for the finding because the finding was never made. Both parties seem to suggest the claim processing notes at AETNA 0278 represent a finding that distinguishes between Plaintiff being disabled from her specific job and being disabled from her occupation in the national economy (as required by the plan definition). But there are several problems. The statement the parties point to reads: "The medical information was reviewed and with the type of surgery performed above, the [employee] was disabled from her own occ[upation]. However, based on the [long term disability] policy def[inition] of own occ[upation], the [employee] is capable of performing the [restrictions/limitations] provided as the [restrictions/limitations] are within her own occ[upation] in the national economy."[7] This is not a finding about whether employers in the national economy would have a problem with Plaintiff's oxycodone use, because it does not mention medication; instead, it talks

---

[6] Defendant's citation for this statement is to an apparently irrelevant page in the record, a disability appeal request form that simply notes Donnelley's refusal to accommodate Plaintiff's oxycodone use as her reason for appeal and says nothing about the national economy or any finding by Aetna (AETNA 0641).

[7] From other usage in the record, it appears that "capable of performing the [restrictions/limitations] provided" actually means capable of performing the occupation under the restrictions/limitations imposed.

about the "type of surgery" involved. In fact, the "plan of action" later in this entry indicates an intention to send the file for review on the medication issue, so this entry certainly is not a final determination on that question. Because "own occupation" by definition refers to the national economy, it is not clear what distinction this note addresses when it says Plaintiff was disabled from her own occupation but not disabled from her own occupation in the national economy.[8] After the peer review that specifically included the medication issue, Aetna issued a formal decision letter. It does not address the impact of the oxycodone (in a summary medical history, the letter briefly notes she was using oxycodone months earlier) and does not discuss any distinction between Plaintiff's specific job and her occupation in the national economy (AETNA 0238-0239).

Rather, what the decision letter does say is that "the medical evidence does not substantiate a functional impairment from a physical or psychological condition" (AETNA 0239). This is the remaining source of misalignment between the arguments the parties have made and the analysis actually required. The focus of the decision letter and Aetna's expert reports is whether Plaintiff has a "functional impairment," a concept not clearly tied to the test for disability under the plan language. That test says Plaintiff is disabled if she "cannot perform the material duties of [her] own occupation [as defined in the national economy] solely because of an illness, injury or disabling pregnancy-related condition" (AETNA 0134). By focusing on functional impairment, the decision letter and expert reports never discuss Plaintiff's capabilities and medical issues vis-à-vis her job duties at all (let alone her job duties as nationally defined). Functional impairment seems

---

[8] It may be a carried-over note that refers to the prior decision, which explained that Plaintiff's occupation is considered sedentary in the national economy and that she was capable of sedentary work. But even that decision makes no distinction between Plaintiff's specific job and the national economy; it simply found she was not disabled. Further, it preceded the oxycodone question.

12

to concern whether Plaintiff has some reduction in capability, not as defined against the demands of her occupation, but as defined against normal, healthy functioning. So focusing the arguments for this review on Aetna's finding that other employers would allow Plaintiff to work while taking oxycodone is mistaken, as there has been no finding regarding either the medication or Plaintiff's occupational duties.

Even where Defendant does recognize that the "national economy" aspect of the plan's test for disability was not actually the basis of Aetna's denial, Defendant accurately identifies the true basis of the denial as Plaintiff's "fail[ure] to present any evidence of a functional impairment" (Defendant's Response in Opposition at 9). But the test for disability under the plan does not call for Plaintiff to prove a functional impairment.

Moving forward, this being a *de novo* review, the Court can directly interpret what the plan language does in fact require Plaintiff to show. Courts interpret ERISA plan terms under normal rules of contract interpretation. *See US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548-49, 185 L. Ed. 2d 654 (2013). Those rules of course address ambiguity, and "contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Donau Furnier, GmbH v. M & T Veneer Corp.*, 715 F. Supp. 2d 604, 609 (M.D. Pa. 2010) (quoting *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)). Under Pennsylvania law, ambiguity in insurance contracts is construed against the drafter by the court as a matter of law. *See Fed. Ins. Co. v. Cont'l Cas. Co.*, No. 2:05-CV-305, 2006 WL 3386625, at *19-20 (W.D. Pa. Nov. 22, 2006); *see also Bauman v. Empire Health Mgmt.*

*Servs.*, No. CIV. A. 98-6481, 2000 WL 217532, at *1-2 (E.D. Pa. Feb. 14, 2000) (following this procedure in a federal ERISA case).[9]

The relevant plan language to be interpreted:

The test of disability is met if: "You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy related condition" (AETNA 0134).

"Material duties" are defined as: "Duties that: Are normally required for the performance of your own occupation; and Cannot reasonably be omitted or modified. However, to be at work in excess of 40 hours per week is not a material duty" (AETNA 0150).

"Own occupation" is defined as: "The occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed: For your specific employer; or At your location or work site; and Without regard to your specific reporting relationship" (AETNA 0151).

"Illness" is "A pathological condition of the body that presents a group of clinical signs and symptoms and laboratory findings peculiar to it and that sets the condition apart as an abnormal entity differing from other normal or pathological body states," and "injury" is "An accidental bodily injury that is the sole and direct result of: An unexpected or reasonably unforeseen occurrence or event; or The reasonable

---

[9] One case from the Third Circuit has held that courts cannot construe against the drafter in the ERISA context because the plan administrator has discretion to interpret the plan. *See Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 123-25 (3d Cir. 2012). But that case applied an abuse of discretion standard of review; here, the plan administrator does not have the same discretion.

unforeseeable consequences of a voluntary act by the person. An act or event must be definite as to time and place" (AETNA 0150).

Applying these terms to the facts of this case, Plaintiff's medical issues—ankle fracture, complex regional pain syndrome, fibromyalgia, lumbar facet arthropathy, lumbar spinal stenosis, neurapraxia in the left saphenous nerve, and ankle, back, and thigh pain—constitute illnesses (and the ankle fracture constitutes an injury). Some of these illnesses were present within the long-term disability timeframe. From the evidence on record, these illnesses did not prevent Plaintiff from performing her material duties in most respects. She had some capacity to sit, stand, walk, drive, push, pull, and bend. Though she required a boot to walk and could not do any significant lifting, her occupation was sedentary and even her own specific employer indicated these limitations could be accommodated (the definition of material duties incorporates accommodation).

Application of the test to one aspect of Plaintiff's illnesses, however—namely, her use of oxycodone—presents ambiguities. First, if the use of oxycodone prevented Plaintiff from performing her duties, would that consequence be solely the result of illness or injury? On one hand, it is indirect, because it is not the illness itself but the treatment interfering with her performance, and because it is at least in part the employer's refusal to let her use the medication that is causing the issue rather than any physical or mental effects of the medication (though Plaintiff did have some drowsiness, the employer appears to have been concerned about even *potential* side effects). On the other hand, if not for the ankle problems and other pain, Plaintiff would not need the oxycodone and could do her job. Second, has Plaintiff been prevented from performing her material duties? From one perspective, Plaintiff was still *able* to do her duties, the

employer just would not *allow* her to do them; the word "perform" might sound like the plan language is indeed referring to functional, active aspects of the job. But from another perspective, being present for work without using oxycodone might be considered one of Plaintiff's duties. In fact, the definition's specific note that being present more than forty hours per week cannot be considered a material duty might imply that some other simple conditions of job performance—as opposed to more functional aspects—could constitute material duties. Reporting for work without narcotics in her system could be such a condition for Plaintiff. The fact that Plaintiff may not have been significantly impaired by the oxycodone does not preclude the employer's requirement that she not use it from being a job duty. Avoidance of even unrealized risks is fundamental to many job duties. A truck driver who developed a condition—or required a medication—that carried a risk of narcolepsy or seizures might reasonably be barred from doing his job even if he presently showed no signs of suffering those symptoms, and there would be little question that his medical issue was keeping him from performing his material duties. It is enough that there are two legitimate sides to each of these interpretive questions; therefore, they constitute ambiguities that the Court can resolve against Aetna as drafter of the plan language. In doing so, the Court finds that because of Plaintiff's illness or injury, via her medication, she could not perform the material duties of her specific job, and her somewhat unusual situation does satisfy the test of disability in those respects.

The question remains, however, whether Plaintiff could perform the material duties of her occupation as defined in the national economy. As noted, there has never in fact been any analysis of whether oxycodone use, absent any apparent negative effects, would cause other employers to bar Plaintiff from working. And because there has been

16

no analysis of the issue, there is no relevant evidence on record. While in general Plaintiff has the burden of demonstrating that she was entitled to benefits, Aetna would ordinarily make a determination on her claim and be the first to consider the national definition of her occupation. Under the circumstances, the case is not appropriate for resolution solely on burden of proof, so the Court cannot grant either of the cross-motions for summary judgment.

Conclusion

A determination on Plaintiff's claim for benefits requires consideration of whether her medication would prevent her from doing her job as defined in the national economy, but the record and Aetna's decision do not address that issue. In conducting a *de novo* review, the Court is not limited to the record used in making the plan determination and may consider additional evidence. *See Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1184-85 (3d Cir. 1991); *Smith v. Cont'l Cas. Co.*, No. 3:01CV0961, 2003 WL 105510, at *2-3 (M.D. Pa. Jan. 10, 2003). Because the Court is not limited to the record, a remand is not always necessary to bring in new evidence for consideration. *See Smith*, 2003 WL 105510, at *3. In this case, however, the parties have not presented any additional evidence on the remaining key issue. *See Carrier v. Aetna Life Ins. Co.*, 116 F. Supp. 3d 1067, 1084 (C.D. Cal. 2015) (noting that while the plaintiff had met her burden of showing eligibility for benefits under the "own occupation" definition applicable during part of the timeframe under review, neither party had presented any evidence regarding the "any reasonable occupation" definition applicable after a certain date, and remanding to the plan administrator for a determination on that

17

issue since the court had no expertise or evidence on which to base a determination itself). Therefore, the matter will be remanded to the plan administrator to consider and make a determination as to whether Plaintiff's use of oxycodone would have prevented her from performing her duties in the national economy as it did in her specific position, either because of the bare fact that she was taking it or because she was experiencing some drowsiness. If so, she should be found eligible for long-term disability benefits because she met the test of disability in all other respects as described in this opinion.